**United States District Court
Northern District of Indiana
Hammond Division**

| | |
|---|---|
| LORENZO STEWART, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 2:06-CV-235 JVB |
| ) | |
| MEDICAL WASTE SOLUTIONS, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

**A.  Background**

On May 27, 2005, the President and Co-Founder of Defendant Medical Waste Solutions, Russel Karlins, hired Plaintiff Lorenzo Stewart for a laborer's position. At the time, the Plaintiff was having difficulty keeping a job and had been in and out of the jail. Karlins hired the Plaintiff as a favor to the Plaintiff's cousin, who was Karlins's close friend.

The Plaintiff's job performance was satisfactory at first but soon became unacceptable. His supervisors warned him repeatedly that he might be discharged if his conduct did not improve, and even suspended him once for three days.

On September 6, 2005, the Plaintiff suffered a work-related injury when another employee accidentally ran over his foot with a forklift. He immediately went to the doctor but returned to work the next day with some work restrictions from his doctor. Two weeks later, his doctor lifted all restrictions, and by December 17, 2005, the Plaintiff had fully recovered from his injury.

Meanwhile, on November 9, 2005, the Plaintiff came to work two hours late and refused

to comply with his supervisor's orders. This led to an argument between him and the supervisor during which the Plaintiff called the supervisor a "mother fucker" and threatened to "bring back some boys with guns." In return, the supervisor referred to the Plaintiff as a "nigger" and a "pussy." Following the incident, the company's officials interviewed both men and eyewitnesses and fired the Plaintiff on the basis of this incident and the previous infractions. In addition, they suspended the supervisor (who had no prior disciplinary or performance issues) for one day without compensation.

On July 10, 2006, the Plaintiff, who is not represented by counsel, sued the Defendant in this Court alleging violations under Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e-5), 42 U.S.C. § 1981, and the Americans with Disabilities Act (42 U.S.C. § 12101).

After a period of discovery, the Defendant moved for summary judgment on all of the Plaintiff's claims. Along with its motion, the Defendant gave the Plaintiff a *Lewis v. Faulkner* notice, *see Lewis v. Faulkner* 689 F.2d 100 (7th Cir. 19820), informing him that a Motion for Summary Judgment had been filed and explaining his responsibilities in countering the motion. In response, the Plaintiff filed a two-page brief and a two-page statement purporting to designate genuine issues of fact. In addition, the Plaintiff filed his own Motion for Summary Judgment. The Defendant responded to the Plaintiff's filings, and the case is now fully briefed.

For the reasons explained below, the Court will grant the Defendant's Motion for Summary Judgment and deny the Plaintiff's Motion for Summary Judgment.

**B.**     **Summary Judgment Standard**

Summary judgment is only appropriate by the terms of Rule 56(c) where there exists "no genuine issue as to any material facts and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. This notion applies equally where, as here, opposing parties each move for summary judgment in their favor pursuant to Rule 56. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 774 (7th Cir.1996). Indeed, the existence of cross-motions for summary judgment does not necessarily mean that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., Inc. v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003). Rather, the process of taking the facts in the light most favorable to the nonmovant, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the court's] review of the record requires that [the court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, In*s., 246 F.3d 975, 983 (7th Cir. 2001) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)). Mindful of these standards, the court now turns to the factual basis for the parties' motions and then to their substance.

**C.     Facts**

Russel Karlins is the President and Co-Founder of Defendant Waste Management Solutions, a company that specializes in the disposal of medical and dental waste products. The company has a processing facility in Gary, Indiana, that employs about forty-six workers.

The Plaintiff is a black man, who worked for the Defendant from April 2005 until November 2005. In April 2005, the Plaintiff's cousin and Karlins's good friend, Larry Stewart, contacted Karlins and asked him if he would consider hiring the Plaintiff. Larry Stewart told

Karlins that the Plaintiff had been unable to keep a job and had been in and out of the jail.

At Larry Stewart's suggestion, the Plaintiff then called Karlins on April 21, 2005, and the two agreed that the Plaintiff would come in for an interview. When the Plaintiff came, Karlins introduced him to Mike Host, the Plant Manager, and Chad Fiegel, one of the floor supervisors. They wanted the Plaintiff to work as a truck driver but learned that he had a prior DUI conviction and thus was disqualified from the position. At that time, Host told the Plaintiff, "Well, even if you don't get the truck driver job, I'm going to get you in this plant one way or the other." (Stewart Dep. at 73–74.)

The Plaintiff was hired on April 27, 2005, as a full-time laborer. His first position was working on the sharps container line, where he reported to Fiegel. The Plaintiff liked that job and felt he was treated fairly. He was responsible for quality control and for filling reusable sharps containers.

In the beginning, the Plaintiff's performance was satisfactory, but after a couple weeks his production began to fall off significantly. Host spoke with him two or three times about working too slowly. Not seeing any improvement, in June 2005, Host transferred the Plaintiff to another position in the plant, washing, stacking, and labeling the medical waste containers. Host told the Plaintiff at the time that if the Plaintiff were not a cousin of Karlins's good friend, he would have probably fired him for unsatisfactory job performance. But instead, Host offered him a transfer so that he could remain employed.

Victor Caballero was the shift foreman overseeing the wash bay. His duties were the same as those of other employees, except that he was responsible for daily job assignments. Caballero was not a manager, and he did not have authority to hire, fire, discipline, transfer,

4

promote, demote, schedule, or even send any of the hourly employees home early. Those were Host's responsibilities.

In his new position, the Plaintiff continued to perform poorly. Host spoke with him again several times about the speed of his work and about not affixing labels on wet drums. He told the Plaintiff that he had recently fired another worker for not doing labels properly. Karlins, too, told the Plaintiff that even though Larry Stewart was his friend, the Plaintiff's work still needed to be satisfactory if he wanted to keep his job. The Plaintiff acknowledged that he was "crystal clear" as to what was expected of him.

On September 6, 2005, Caballero accidentally ran over the Plaintiff's foot with a forklift. Host immediately told Caballero to drive the Plaintiff to the doctor for a medical exam. Upon examination, the doctor gave the Plaintiff some pain medication and released him to work the next day. The doctor instructed him to sit down as much as possible and to use a cane when standing up. The Plaintiff returned to work the next day and was able to do his job within the limitations prescribed by the doctor.

Two weeks later, the doctor released the Plaintiff to work without any restrictions. At that time, he only needed to wear an orthopedic shoe, which he was able to do at work without any limitations. By December 17, 2005, the Plaintiff had recovered fully.

Meanwhile, the Plaintiff's work performance did not improve. In September or October 2006, Host found the Plaintiff outside the plant working on his car during work hours. He again warned the Plaintiff about his behavior and told him that attending to personal matters during work hours was unacceptable. On November 9, the Plaintiff punched in for work more than one hour before the start of his shift, then went to sleep in his car. He did not actually report for work

until twenty minutes after the start of the shift. As a result, the Plaintiff was given a written warning and suspended for three days without pay. He was also warned about excessive cell phone use at work.

Ten days later, on Saturday, November 19, the Plaintiff came to work almost two hours late. When he arrived, Cabellero told him to start moving some of the bins in the wash bay, but the Plaintiff complained that there was not enough room to do his job. Several times during the shift, the Plaintiff left the wash bay and walked around the plant rather than do what he was asked. At the end of the shift, Caballero and the Plaintiff got into a heated argument about the Plaintiff's unwillingness to do the job. As things escalated, the Plaintiff called Caballero a "mother fucker." He also threatened to "bring back some boys with guns." Caballero responded by repeatedly calling the Plaintiff a "nigger" and a "pussy." Caballero then called Host, who spoke with the Plaintiff and sent him home for the day.

The following Monday, November 21, Pete Dyke, the Defendant's Vice President, and Host met with Caballero and the Plaintiff to review the incident. During the meeting, the Plaintiff admitted that he came to work late and that he did not want to work that day. He admitted that he told Caballero several times that there was not enough room to do his job, that he had an argument with Caballero, and that he called Caballero a "mother fucker."

Caballero told them that the Plaintiff threatened to "bring back some boys with guns," which the Plaintiff denied. Dyke and Host then privately interviewed Roman Contreras, another worker who had witnessed the incident. Contreras confirmed that the Plaintiff had indeed made the threat. Caballero also admitted to calling the Plaintiff a "nigger" and a "pussy," but said that he had done so in response to the Plaintiff's threats and calling him a "mother fucker."

6

During the investigation, Dyke and Host, in the presence of both Caballero and the Plaintiff, watched the videotape from the surveillance cameras in the plant. They saw the Plaintiff repeatedly leaving his work site during the shift and sitting for extended periods of time without working. They also observed the Plaintiff's work area and concluded that there was plenty of room for him to do his job.

At the end of the meeting, Dyke told Caballero and the Plaintiff that he was disappointed in both of them. Dyke then said that Caballero would be suspended for one day without compensation for using racial slurs, and that the Plaintiff would be fired because of his previously deficient work performance and the latest incident.

During his deposition, the Plaintiff admitted that he never heard Karlins, Dyke, or Host use any racist language or jokes. He testified that Karlins was a fair man who had never treated him badly because of his race.

**D.     Discussion**

**(1)**     *Race Discrimination*

In his Complaint, the Plaintiff alleges that the Defendant discriminated against him on the basis of his race by terminating his employment, by creating a hostile work environment, and by retaliating against him, all in violation of Title VII and 42 U.S.C. § 1981. Both statutes prohibit discharging an individual or otherwise discriminating against any individual with respect to his compensation, terms, conditions**,** or privileges of employment, because of such individual's race.

*See* 42 U.S.C. § 2000e-2(a)(1).[1] In order to prevail on an employment discrimination claim, a plaintiff must show that the employer had an intent to discriminate; such a showing may be made directly, or indirectly through the use of an inferential burden-shifting method. *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004).

In the absence of direct or circumstantial evidence, as is the case here, a plaintiff may establish a prima facie case of discrimination through the *McDonnell Douglas* indirect method of proof by showing that (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) the employer took an adverse employment action against him; and (4) the employer treated similarly situated individuals outside of the protected class more favorably. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004).

If the plaintiff establishes a prima facie case of discrimination, the employer must then articulate a legitimate, nondiscriminatory reason for its employment decision. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If the employer sets forth a legitimate reason for its employment decision, the burden shifts back to the plaintiff to establish that the employer's proffered reason was pretextual. *Id.* The burden of persuasion remains at all times with the plaintiff. *Id*.

The Plaintiff has failed to establish a prima facie case of race discrimination, as he has not shown that he was meeting the Defendant's legitimate expectations or that similarly situated individuals outside of the protected class were treated more favorably than he was. Although the Plaintiff's work was initially acceptable, just two weeks after being hired, he began getting

---

[1]The Court will not separately consider the Plaintiff's claim under 42 U.S.C. § 1981, as both Title VII and § 1981 employ the same analysis. *See Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 682 (7th Cir. 2001).

8

negative reviews. Host spoke with him several times and eventually transferred him from the sharps line to another position in the plant. But even then his work performance did not improve. Host again admonished the Plaintiff about his deficient work performance, yet nothing changed. Karlins, too, talked with the Plaintiff and warned him that being his friend's cousin was not by itself sufficient to remain employed at the Defendant's facility.

Among other things, the Plaintiff was also warned about working on his car outside the plant during work hours. On another occasion, he received a written reprimand and was suspended for three days without pay for clocking in early and then sleeping in his car, as well as for using his cell phone excessively during work hours. Finally, he was fired after reporting to work almost two hours late, refusing to follow his supervisor's orders, wandering around the facility rather than being at his work station, and then getting into a verbal altercation with a shift supervisor during which he called the supervisor a "mother fucker" and threatened him with physical harm.

By the same token, the Plaintiff has failed to identify any other employee not in the protected class who engaged in similar conduct but was not discharged. Having reviewed all materials submitted in this case, the Court cannot find such an individual either.

The Plaintiff's failure to establish a prima facie case ends his discrimination claim. But even if the Court were to assume that he has met that burden, the Plaintiff would have failed nevertheless as he is unable to show that the Defendant's proffered reasons for his firing were pretextual. It is undisputed that Caballero had no managerial authority and was not involved in the decision to fire the Plaintiff. Therefore, any hostility on his part toward the Plaintiff may not be imputed against the Defendant. Furthermore, the Plaintiff has presented no evidence

challenging the sincerity of Dyke's and Host's beliefs that his work performance warranted a discharge, and that they acted upon that belief.

The Plaintiff's hostile work environment claim fairs no better. Undoubtedly, Caballero's racial slurs toward the Plaintiff were inappropriate and unacceptable. Yet, on the basis of this single incident the Plaintiff cannot establish a hostile work environment claim. "A hostile work environment exists where the employee is subject to conduct so severe and pervasive that a reasonable person would find the work environment abusive or hostile. *Salvadori v. Franklin School Dist.*, 293 F.3d 989, 997 (7th Cir. 2002). "Relatively isolated instances . . . will not support a claim of a hostile environment." *Filipovic v. K & R Exp. Systems, Inc.*, 176 F.3d 390, 398 (7th Cir. 1999) (citing *Ngeunjuntr v. Metro. Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998)).

The Plaintiff does not provide any evidence suggesting that he was the victim of pervasive racial harassment. Besides his altercation with Caballero, no other incidents of racial name calling or other derogatory behavior are reflected in the record. Moreover, the Plaintiff is unable to demonstrate that the Defendant ignored Caballero's actions. Quite the opposite happened: Caballero was reprimanded and suspended without compensation for one day. Accordingly, the Plaintiff's hostile work environment claim fails as a matter of law.

As to his retaliation claim, the Plaintiff has presented no evidence that he has engaged in a statutorily protected activity. Accordingly, his retaliation claim is baseless. *See Sitar v. Ind. Dept. of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) ("An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints.") (quoting *Miller v. Am.*

*Fam. Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000).

**(2)**     *Americans with Disabilities Act*

In his Complaint, the Plaintiff alleges that the Defendant violated the Americans with the Disabilities Act by not providing him with reasonable accommodation after the forklift accident. In his response to the Defendant's Motion for Summary Judgment the Plaintiff seems to have abandoned that claim. In any case, the Plaintiff's claim is meritless and summary judgment in the Defendant's favor is proper.

To establish a prima facie case of disability discrimination, "a plaintiff must show that (1) he was disabled; (2) he was otherwise qualified for his previous employment position with or without reasonable accommodation; and (3) he suffered an adverse employment decision." *Jackson v. City of Chi.*, 414 F.3d 806, 810 (7th Cir. 2005). If the plaintiff makes his prima facie case, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its adverse action. "If the employer does so, the inference of discrimination disappears, and the plaintiff must prove by a preponderance of the evidence that the employer's proffered reason was a pretext for intentional discrimination. The ultimate burden to prove intentional discrimination remains with the plaintiff." *Dvorak v. Mostardi Platt Associates, Inc.*, 289 F.3d 479, 485 (7th Cir. 2002) (internal citation omitted).

The Plaintiff has failed to establish a prima facie case for he was neither qualified to work for the Defendant with or without reasonable accommodation nor was he disabled. As explained above, the Plaintiff did not meet the Defendant's reasonable expectations. In addition, the Plaintiff's injury was temporary and there is no evidence that it limited any of his major life

11

activities, so as to fall under the protection of the Americans with Disabilities Act. *See* 42 U.S.C. § 12102(2)(A) ("The term "disability" means, with respect to an individual — (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.").

But even if the Plaintiff had established a prima facie case, his disability claim would fail nevertheless: for the same reasons that he was unable to show pretext under his racial discrimination claim, he is unable to show pretext under his Americans with Disabilities Claim. There is no evidence that Dyke and Host fired the Plaintiff for any other reason than the one they sincerely believed in, that is, that the Plaintiff was not meeting their reasonable expectations.

**E.     Order**

For these reasons, the Court grants the Defendant's Motion for Summary Judgment [DE 24] and denies the Plaintiff's Motion for Summary Judgment [DE 30].

SO ORDERED on January 3, 2008.

    s/ Joseph S. Van Bokkelen  
Joseph S. Van Bokkelen  
United States District Judge